# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

SUSAN H.,[1]

                    Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Soc. Sec. Admin.,

                    Defendant.

Case No. 4:20-cv-00030-TMB

## DECISION AND ORDER

On or about December 8, 2017,[2] Susan H. ("Plaintiff") protectively filed an

application for disability insurance benefits ("SSDI") under Title II of the Social Security

Act ("the Act").[3] In her application, Plaintiff alleged disability beginning February 1, 2016.[4]

She subsequently amended her onset date at the administrative hearing to July 1, 2017.[5]

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Administrative Record ("A.R.") 32. The record appears to contain only the application summary, not the application itself. The application summary lists December 28, 2017 as the application date. A.R. 228.

[3] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought claims under Title II. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[4] A.R. 228.

[5] A.R. 32, 76. In a footnote to Plaintiff's opening brief, Plaintiff also moved to amend her Complaint

Plaintiff has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[6] Plaintiff's opening brief asks the Court to reverse and remand the agency's decision for further administrative proceedings.[7] The Commissioner filed an Answer and a brief in opposition to Plaintiff's opening brief.[8] Plaintiff filed a reply brief on March 11, 2021.[9] Oral argument was not requested and was not necessary to the Court's decision. On August 26, 2021, Defendant Commissioner Saul was substituted by Acting Commissioner Kilolo Kijakazi pursuant to Federal Rule of Civil Procedure 25(d).[10] This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[11] For the reasons set forth below, Plaintiff's request for relief is granted.

## I. STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[12] "Substantial evidence" has been defined by the United States Supreme Court as "such

---

to reflect Plaintiff's amended onset date of July 1, 2017. Docket 18 at 2, n. 1.

[6] Docket 1 (Plaintiff's Compl.).

[7] Docket 18 (Plaintiff's Br.).

[8] Docket 15 (Answer); Docket 20 (Defendant's Br.).

[9] Docket 21 (Reply).

[10] Docket Annotation (August 26, 2021).

[11] 42 U.S.C. § 405(g).

[12] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 2 of 25

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13] In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[14] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[15] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[16] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[17] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[18] In particular, the

---

[13] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[14] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[15] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[16] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[17] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[18] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[19]

## II.  DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[20]  In addition, Supplemental Security Income ("SSI") may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[21]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[22]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[23]

---

[19] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[20] 42 U.S.C. § 423(a).

[21] 42 U.S.C. § 1381a.

[22] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[23] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[24]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[25]  If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[26]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[27]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity."[28]  *The ALJ determined that Plaintiff had not engaged in substantial activity since July 1, 2017, the amended alleged onset date.*[29]

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the

---

[24] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[25] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[26] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[27] *Tackett*, 180 F.3d at 1101.

[28] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[29] A.R. 34.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 5 of 25

twelve-month duration requirement.[30]  *The ALJ determined that Plaintiff had the following medically determinable severe impairments: pelvic relaxation, probable migraine headaches, and unexplained falling/weakness episodes.  The ALJ also determined that Plaintiff's rectal prolapse was non-severe.  The ALJ did not consider the evidence related to Plaintiff's mental impairments "in light of [Plaintiff's] statement at the hearing, made through her representative, that she is not alleging disability on the basis of any mental impairments."[31]*

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.[32]  *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[33]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis

---

[30] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[31] A.R. 35.

[32] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[33] A.R. 35.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 6 of 25

despite the limitations from her impairments, including impairments that are not severe.[34]

*The ALJ determined that Plaintiff had the residual functional capacity to perform light work, except she can only perform occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; and must avoid all unprotected heights and moving or hazardous machinery.*[35]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[36] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that Plaintiff was capable of performing her past relevant work as a cleaner, housekeeping; and music teacher.*[37]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[38] *The ALJ did not reach Step 5 in his analysis.*[39]

---

[34] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[35] A.R. 35–36.

[36] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[37] A.R. 42.

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[39] A.R. 42.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 7 of 25

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from July 1, 2017 through the date of the ALJ's decision.[40]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1971 and is 50 years old.[41]  She reported working as a housekeeper and violin teacher.[42]  On June 28, 2018, the Social Security Administration ("SSA") determined that Plaintiff was not disabled under the applicable rules.[43]  Plaintiff appeared and testified with representation at a hearing held on July 24, 2019 in Fairbanks, Alaska before ALJ Paul Hebda.[44]  On August 12, 2019, the ALJ issued an unfavorable ruling.[45]  On July 20, 2020, the Appeals Council denied Plaintiff's request for review.[46]  On August 20, 2020, Plaintiff appealed the Commissioner's final decision to this Court; she is represented by counsel in this appeal.[47]

## IV.    DISCUSSION

In her opening brief, Plaintiff alleges: 1) the evidence submitted to the Appeals Council after the ALJ's decision was new and material and shows a medically

---

[40] A.R. 42.

[41] A.R. 228.

[42] A.R. 297.

[43] A.R. 131.

[44] A.R. 99–111.

[45] A.R. 32–42.

[46] A.R. 1–6.

[47] Docket 1.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 8 of 25

determinable impairment that accounts for Plaintiff's disabling symptoms and 2) the ALJ failed to articulate clear and convincing reasons to discount Plaintiff's symptom testimony.[48] The Commissioner contends that the ALJ reasonably discounted Plaintiff's statement about the severity of her impairments, Plaintiff fails to show remand is warranted for consideration of additional evidence submitted after the ALJ's decision, and the ALJ's decision is supported by substantial evidence.[49] The Court will address Plaintiff's claims below.

A. New Evidence Submitted After the ALJ Decision

Plaintiff asserts that the medical records submitted to the Appeals Council after the ALJ's decision "radically change[ ] the analysis of this case."[50] The additional evidence includes medical records from Fairbanks Psychiatric and Neurological Clinic from March 27, 2019 to September 19, 2019.[51] Although the Appeals Council reviewed this evidence, the Council did not exhibit the evidence because it determined that the evidence did not "show a reasonable probability that it would change the outcome of the decision."[52] Plaintiff's new evidence also included a letter from Kaitlin Roehl, PA-C, dated October 3, 2019; a letter from Romel Wren, M.D., dated October 8, 2019; and treatment records from

---

[48] Docket 18 at 7–15.

[49] Docket 20 at 3–15.

[50] Docket 18 at 12.

[51] A.R. 25–28

[52] A.R. 2, 5–6.

Vokter Heart and Vascular Center, dated October 3, 2019.[53]  Regarding this evidence, the Appeals Council determined that it did not relate to the period at issue.[54]  As noted by the Commissioner, Plaintiff has not argued that the Roehl letter, Wren letter, or treatment records from Vokter Heart and Vascular Center would change the outcome of the ALJ's decision.[55]

In the Ninth Circuit, "when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence."[56]  The Appeals Council will review a claimant's case if the claimant provides good cause for not submitting the evidence to the ALJ pursuant to 20 C.F.R. § 404.935.[57]  The additional evidence must also be "new, material, and relate[ ] to the period on or before the date of the hearing decision, and there [must be] a reasonable probability that the additional evidence would change the outcome of the decision."[58]

---

[53] A.R. 11–24.

[54] A.R. 2.

[55] Docket 20 at 9.  *See also* Docket 18 at 12 ("In sum, the existence of medical records that officially diagnose [Plaintiff] with functional neurological disorder radically changes the analysis of this case.  This evidence requires remand to allow the ALJ to consider the case in light of this diagnosis.").

[56] *Brewes v. Comm'r Soc. Sec. Admin.,* 682 F.3d 1157, 1159–60, 1162–63 (adopting *Ramirez v. Shalala,* 8 F.3d 1449, 1451–52 (9th Cir. 1993)).

[57] 20 C.F.R. § 404.970(b).

[58] 20 C.F.R. § 404.970.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 10 of 25

Here, Plaintiff contends that good cause exists for not presenting the records at the time of the hearing because they were generated after the hearing date on July 24, 2019. She also contends that the functional neurological disorder diagnosis by Alisabeth Thurston-Hicks, M.D., on September 12, 2019, renders testifying Dr. LeBeau's opinion incomplete, and that the RFC did not include all of Plaintiff's limitations.[59]

Although Dr. Hicks assessed Plaintiff with a suspected somatic symptom disorder or conversion order as early as March 22, 2016 and continued to diagnose Plaintiff with a suspected functioning neurological symptom disorder (conversion disorder) throughout the relevant period, Dr. Hicks consulted with an expert in functional neurological disorder and officially diagnosed Plaintiff on September 12, 2019.[60] The mental disorder SSA Listings define somatic symptom and related disorders, including conversion disorder, under Listing 12.07 as:

> [C]haracterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience. These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed. Symptoms and signs may include, but are not limited to, pain and other abnormalities of sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.[61]

---

[59] Docket 18 at 7–12; Docket 21 at 3–5; A.R. 25.

[60] A.R. 25, 50, 641–42, 644, 646, 648, 650, 652, 654, 656, 658, 660.

[61] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00B(6) (2018).

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 11 of 25

Medical evaluations made after the ALJ's decision may be relevant to the evaluation of a claimant's conditions during the disability period.[62] In this case, Dr. Hicks's assessment in September 2019 is the most recent prognosis of Plaintiff's "unexplained falling/weakness episodes."[63] This new diagnosis provides a basis for evaluating the ALJ's assessment of Plaintiff's mental and physical limitations.

Given the physical and psychological aspects of a functional neurological symptom disorder diagnosis, Dr. Hicks's post-hearing diagnosis has a reasonable probability of changing the outcome of Plaintiff's case and should be considered by a medical expert and evaluated by the ALJ. Based on Dr. Hicks's consultation with John Stone, M.D., of the Functional Neurological Society, Dr. Hicks opined that Plaintiff has a "poor prognosis even with targeted persistent supportive treatment, and no such treatment appears available in Alaska or Washington State." Dr. Hicks noted, "[p]er Dr. Stone, this condition is highly disabling, disabling as many as 80% of the people who have chronic symptoms." Dr. Hicks also opined that Plaintiff's "condition with episodic falls and weakness is particularly difficult to target with informed physical therapy."[64]

The Commissioner asserts that the additional evidence submitted by Plaintiff "simply supplies a label for the unexplained drop attacks, which the ALJ already found

---

[62] *Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F. 1228, 1232–33; *see also Ancynthina H. v. Saul,* 2020 WL 9422346, at *6 (C.D. Cal. November 24, 2020).

[63] A.R. 34.

[64] A.R. 25.

was a severe impairment and reasonably concluded was not disabling."[65]  However, without Dr. Hicks's official diagnosis, the medical experts did not have an opportunity to fully address the impact of Plaintiff's functional neurological symptom disorder.[66] Although Dr. Lebeau testified that Plaintiff's symptoms seemed to be physical rather than psychological, he also testified that some of Plaintiff's symptoms, including fatigue, dizziness, and weakness lasting for multiple days after a "drop attack," could not be explained physiologically.[67]  Dr. Lebeau mentioned several possible causes for Plaintiff's falls in the record, including periodic paralysis, epilepsy, and dysautonomia, but opined that Plaintiff had "an undiagnosed condition that seems to be able to take her out of contention sort of briefly if she lies down, and she falls down or whatever."  He also testified, "I don't think we have any doctor in this track that I've read that really thinks and believes in a satisfactory diagnosis in this matter.  I certainly don't feel that I have even a diagnosis that I favor particularly."[68]

In his decision, the ALJ found Plaintiff's unexplained falling/weakness episodes to be a severe impairment, but the ALJ determined that "including this impairment among her severe impairments is in viewing the overall record in a light most favorable to her." The ALJ specified, "[t]his is because the fact that [Plaintiff's drop attacks] are unexplained, as testified to at the hearing by medical expert Dr. Lebeau and explained in detail below,

---

[65] Docket 20 at 10.

[66] A.R. 78, 80–99.

[67] A.R. 96, 98.

[68] A.R. 85.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 13 of 25

in fact supports a finding that this impairment is non-medically determinable."[69] Additionally, the ALJ noted that Dr. Lebeau indicated through his testimony that additional workplace accommodations, "such as the need for a cot next to the [Plaintiff's] workstation in order to lie down if she felt weak or five to 10-minute periods beyond normal breaks that would allow her to recover from drop attacks such that she could get back to work, are not clearly supported by the medical evidence of record in this case."[70]  However, the new evidence provides a possible explanation for Plaintiff's "drop attacks."  This evidence should be thoroughly evaluated by a medical expert and discussed to determine if any workplace accommodations are necessary as a result.

Moreover, Plaintiff's attorney agreed to relieving the psychological expert from testifying because Plaintiff was not alleging a disabling impairment due to anxiety and depression.[71]  As a result, the ALJ did not consider Plaintiff's mental impairments at all in his decision, contributing to the inadequate evaluation of Plaintiff's "drop attacks" in light of Dr. Hicks's official functional neurological symptom disorder diagnosis.[72]  In sum, the official functional neurological symptom disorder diagnosis from Dr. Hicks provides an

---

[69] A.R. 34–35.

[70] A.R. 38.  The ALJ relied heavily on Dr. Lebeau's testimony in formulating the RFC.  As part of his analysis of Dr. Lebeau's testimony regarding the RFC, the ALJ concluded that any additional workplace accommodations, such as a cot next to Plaintiff's workstation, were not supported by the medical evidence.  Although the ALJ attributes this conclusion to Dr. Lebeau, the doctor's testimony reads, "[b]ut if [Plaintiff] had a desk job, and she had [a] cot next to it where if she felt weak or something, she could lie down for a bit, that might be an accommodation that's possible."  Dr. Lebeau then clarified that he was not the vocational expert.  A.R. 86.

[71] A.R. 78.

[72] A.R. 35.

explanation that would likely change the testimony of a medical expert regarding Plaintiff's "drop attacks," and change the resulting RFC.

For the reasons above, the ALJ's decision is not supported by substantial evidence. The new evidence diagnosing Plaintiff with functional neurological symptom disorder requires remand to allow the ALJ to consider Plaintiff's mental and physical impairments in light of the new evidence.

B. <u>Symptom Testimony</u>

Plaintiff alleges that the ALJ failed to provide clear and convincing reasons for discounting her subjective complaints. Specifically, she asserts that, in light of the new evidence, the ALJ's reliance on Dr. Lebeau's testimony was inappropriate. As set forth above, the Court agrees.

Plaintiff also asserts that reliance on objective findings alone for disregarding a claimant's symptom testimony is not a clear and convincing reason in this case. Plaintiff alleges that the ALJ also erred by discounting her symptom testimony as inconsistent with her activities of daily living.[73] The Commissioner responds that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective testimony.[74]

---

[73] Docket 18 at 12–15.

[74] Docket 20 at 3–8. In a footnote, the Commissioner asserts that "the 'clear and convincing reasons' standard is inconsistent with the deferential substantial evidence standard set forth in 2 U.S.C. § 405(g), as well as agency regulations and rulings specifying the rationale its adjudicators should provide in support of their findings." Docket 20 at 4, n.1.

An ALJ's assessment of a claimant's symptoms has two steps.[75] First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[76] In the first step, the claimant need not "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[77] Here, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms that Plaintiff described.[78] He determined that Plaintiff's pelvic relaxing, probable migraine headaches, and unexplained falling/weakness episodes were severe.[79]

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms.[80] This standard is "the most demanding required in Social Security cases."[81] Here, the ALJ

---

[75] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).

[76] *Id.* (quoting *Garrison v. Colvin,* 759 F.3d 995, 1014–15 (9th Cir. 2014)).

[77] *Id.*

[78] A.R. 37.

[79] A.R. 34.

[80] *Trevizo,* 871 F.3d at 678.

[81] *Id.*

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 16 of 25

found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.[82] To make this finding, the ALJ was required to provide specific, clear and convincing reasons for discounting Plaintiff's symptom testimony.[83]

Plaintiff testified that her "drop attacks" could go on for "several weeks at a time" and "even over a month at a time." She testified that during one of these episodes she would "feel [her] knees buckle" and she had to work hard to straighten her knees. She indicated that when she walked through a doorway, she would feel that her knees were about to give way. She described feeling "a strange pressure on the side of my face, and it feels like the room is tilting. And sometimes when I'm lying in bed, it feels like the bed is sliding around, and it becomes hard to read things. And it's more difficult to focus on things and understand things." She then stated, "This – the drop attack where I fall down, I may be able to get up after that, but that's just the tip of the iceberg. That's the part that everyone sees, but they don't see what's going on inside of me, and how hard I'm struggling to stand up even if I look normal." Plaintiff also testified that she was a violin teacher. She testified that, in the past, she worked in excess of 40 hours per week, teaching 48 students each week, playing in the symphony orchestra, and playing in a

---

[82] A.R. 38.

[83] *Trevizo,* 871 F.3d at 679 (citing *Lingenfelter v. Astrue,* 504 F.3d 1028, 1041 (9th Cir. 2007)).

band. At the time of the hearing, Plaintiff testified that she currently taught three students, but because of dizziness and weakness, she missed "at least a quarter of the lessons with them." She testified that she could not do more than one violin lesson at a time and needed two to three hour naps every day. She testified that she still volunteered in the Fairbanks Symphony Orchestra and attended the three-hour rehearsals. However, she also stated that she had "literally fallen out of the chair while I was playing during the rehearsal, and fallen on the ground with my violin. And, sometimes I have to sneak out the back and go lie down for a while because I just cannot stay sitting up playing my violin that long." She indicated that she was able to continue to play in the orchestra because "they're willing to let me play with the understanding that I might not make it." She testified that she no longer played in a band because she was "too tired and too dizzy and too sick."[84]

Plaintiff testified that she felt fatigued and hazy after a "drop attack," her speech became a little slurred, and she had trouble answering people's questions. She testified that she had about seven "drop attacks" per month and that it would take about an hour to function normally again. She indicated that work involving speaking to another person was "out of the question" and if she tried to do a sit-down job, she would have to spend all of her time "willing myself to stay sitting up because I'm so exhausted and weak, so that there's not much brain power left for doing anything useful." She testified to having migraines two to three times per week. Plaintiff also testified that she had symptoms of

---

[84] A.R. 100–03.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 18 of 25

fatigue, dizziness, and had to use the restroom quite often during the day due to intestinal issues. She estimated that she would be able to function on a job for two days a week for three hours a day.[85]

An ALJ may reject symptom testimony if it is contradicted by the medical evidence, but the ALJ "may not discredit the claimant's subjective complaints solely because the objective evidence fails to fully corroborate the degree of pain alleged."[86] Here, the ALJ discounted Plaintiff's symptom testimony because it was inconsistent with the objective evidence.[87] Regarding Plaintiff's "drop attacks," the ALJ noted that Dr. Lebeau testified that Plaintiff's MRIs were negative and her neurological examinations were negative "over and over again." The ALJ also noted that Dr. Lebeau testified that Plaintiff's reports of "drop attacks" lasting for days was not physiologic. The ALJ pointed out that Dr. Lebeau testified that there was no evidence of a "mental cloud" associated with Plaintiff's falls in the medical record, in contrast to Plaintiff's testimony that after a fall, it was harder for her to read, focus, and understand things.[88] Regarding Plaintiff's pelvic relaxation and probable migraine headaches, the ALJ concluded that "the objective medical record shows no consistent descriptions of muscle weakness as something that is a constant

---

[85] A.R. 106–07, 109–10.

[86] *Coleman v. Saul,* 979 F.3d 751, 756 (9th Cir. 2020) (citing *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)).

[87] A.R. 39–40.

[88] *Id.* The Court's review of the record shows that Plaintiff did report to a provider at the Mayo Clinic in January 2017 that she had "spells" almost daily that began with blurred vision and "brain fog," accompanied by a feeling that the room was tilting and pressure on the sides of her face. A.R. 525.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 19 of 25

problem for the claimant, nor does it show[ ] that she is in bad shape from a constitutional standpoint."[89]

However, the ALJ failed to consider Plaintiff's functional neurological symptom disorder. As set forth above, with a conversion disorder, the victim actually and subjectively experiences symptoms without a known or clinically verifiable medical cause. Because the ALJ did not have the benefit of Dr. Hicks's functional neurological symptom disorder diagnosis, the ALJ did not consider that the origin of Plaintiff's symptoms could have been psychological. As a result, the ALJ's determination that Plaintiff's testimony was inconsistent with the objective evidence is not supported by substantial evidence.

Next, the ALJ rejected Plaintiff's symptom testimony based on inconsistency with Plaintiff's daily activities.[90] In the Ninth Circuit, if a claimant "is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."[91] A claimant's daily activities may be used to discount her symptom testimony only if her level of activity is inconsistent with her claimed limitations.[92] "One does not need to be utterly incapacitated in order to be disabled."[93]

---

[89] A.R. 39.

[90] A.R. 40.

[91] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

[92] *Garrison v. Colvin,* 759 F.3d 995, 1016 (9th Cir. 2014).

[93] *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (internal quotations and citations omitted).

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 20 of 25

The ALJ determined that Plaintiff's testimony was inconsistent with her "ongoing en[g]agement in past relevant work to some extent and playing in the Fairbanks Symphony Orchestra, her reports since the amended alleged onset date of moving out of her parent's house and thereafter living alone and being very busy with housework."[94] The ALJ also discounted Plaintiff's testimony because of Plaintiff's reports of signing up for classes at the University of Alaska Fairbanks and engaging in daily exercise, including walking.[95]

In her function report from June 2018, Plaintiff indicated difficulties with her personal care, including feeling weak and dizzy in the shower and "falling on the floor afterwards." She reported feeling too exhausted to hold her arms up to style her hair and not having the energy to cook or falling down while cooking. She also reported that on the days she felt better, she could perform household chores, including dishes, laundry, cooking, and limited cleaning, but that on other days, "I only have the energy to lie in bed." She indicated that she was able to drive, but she often felt too dizzy and weak to drive herself or to walk. She reported that sometimes when she went out for a walk, she would fall down and was unable to walk back without assistance. Plaintiff reported that she attended orchestra rehearsals, but she had to rest in the middle of the rehearsal

---

[94] A.R. 40. The handwritten note from Plaintiff's provider that the ALJ points to as inconsistent with Plaintiff's symptom testimony is difficult to read and the meaning unclear. The provider commented that Plaintiff canceled her therapy appointment because she was very busy, but the reason given could have been "housework" or "homework." A.R. 619. Regardless, the ALJ may not single out "a few periods of temporary well-being from a sustained period of impairment and rel[y] on those instances to discredit [a claimant]." *Garrison v. Colvin,* 759 F.3d 995, 1018 (9th Cir. 2014).

[95] A.R. 40.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 21 of 25

sometimes and felt too tired and weak to drive home. Members of the orchestra would provide her with rides to and from rehearsals. She reported falling out of her chair during a symphony rehearsal.[96]

The medical record is also replete with reports of Plaintiff's difficulties due to recurring falls. In March 2016, Plaintiff reported to a provider that she had "stopped teaching violin lessons, dropped her spring semester college classes and struggle[d] to go into town" due to her falling episodes.[97] In June 2016, Plaintiff reported living with her parents and being unable to work or drive due to falling spells.[98] In July 2016, Plaintiff stated that she "doesn't see herself being able to teach violin as long as she is having her current symptoms."[99] In December 2016, Plaintiff reported to Dr. Hicks that "[i]f she engages in house chores, she has to take multiple breaks when she feels lightheaded" and that she shopped occasionally with her mother, but usually needed breaks during the outing.[100] At the Mayo Clinic in January 2017, Plaintiff reported that she was too fatigued to teach violin or participate in the orchestra and had episodes of blurry vision too often to be able to read music.[101] In May 2017, she reported to a provider that she occasionally

---

[96] A.R. 279–87.

[97] A.R. 638.

[98] A.R. 642.

[99] A.R. 644.

[100] A.R. 648.

[101] A.R. 525.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 22 of 25

needed her parents to help her walk due to dizziness.[102] In June 2017, Plaintiff reported that she recently played her violin, but that "committing to playing with an orchestra tends to make her increasingly anxious as she is unsure if she can fulfill her commitment."[103]

After the amended onset date of July 1, 2017, Plaintiff reported some improvement of her symptoms, but also continued to report daily activities consistent with her symptom testimony. In October 2018, Plaintiff reported being involved in community activities "now that she is able, such as contra dancing."[104] In November 2018, Plaintiff reported teaching violin.[105] At a cognitive evaluation on January 1, 2019, Plaintiff reported that "on an ideal day, she went to class, the library, lunch, studied, went to class, returned home, sometimes fell in the parking lot due to weak legs and dizziness, after which the professors helped her, had dinner, did chores, and sometime[s] taught a violin lesson." However, she added that "she more often struggles through her day" and that she tries to walk but sometimes cannot return.[106] In July 2019, Plaintiff reported having difficulty signing her name, remembering the year, and had problems with word-finding.[107] In sum,

---

[102] A.R. 379.

[103] A.R. 654.

[104] A.R. 660.

[105] A.R. 857.

[106] A.R. 577.

[107] A.R. 50.

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 23 of 25

the record shows Plaintiff "repeatedly and consistently described the severe limitations on her ability to complete daily activities."[108]

For the reasons explained above, the ALJ failed to meet the high bar for rejecting Plaintiff's symptom testimony. The ALJ failed to provide clear and convincing reasons for discounting Plaintiff's symptom testimony. On remand, the ALJ will reconsider Plaintiff's symptom testimony.

C. Scope of Remand

Plaintiff asks the Court to reverse the final agency decision and remand to the Commissioner for further proceedings.[109] The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[110] In this case, the proper remedy is reversal and remand for further administrative proceedings and the issuance of a new decision with appropriate findings at each step of the sequential evaluation.

The ALJ shall elicit opinions from medical experts regarding the mental and physical limitations caused by Plaintiff's functional neurological symptom disorder. The ALJ shall consider and discuss the new evidence provided to the Appeals Council,

---

[108] *Revels v. Berryhill,* 874 F.3d 648, 668 (9th Cir. 2017).

[109] Docket 18 at 16.

[110] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

Case No. 4:20-cv-00030-TMB
Decision and Order
Page 24 of 25

including Dr. Hicks's diagnosis and the impact of Plaintiff's functional neurological symptom disorder on Plaintiff's mental and physical impairments. The ALJ should reevaluate Plaintiff's symptom testimony. Based on all of this, the ALJ should reevaluate the RFC and proceed as necessary.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and not supported by substantial evidence in the record. Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 18 GRANTED, the Commissioner's motion at Docket 20 is DENIED, and this matter is REMANDED for further proceedings consistent with this order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 16th day of November, 2021 at Anchorage, Alaska.

*/s/ Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE